UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DMO NORWOOD LLC,<br>D/B/A DAN O'BRIEN KIA NORWOOD,<br><br>     Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>KIA AMERICA, INC.,<br><br>     Defendant and Counterclaim Plaintiff. | CIVIL ACTION NO.: 1:22-cv-10470-ADB |

**<u>DMO NORWOOD LLC, D/B/A DAN O'BRIEN KIA NORWOOD'S MEMORANDUM
OF LAW IN OPPOSITION TO KIA AMERICA, INC.'S MOTION TO COMPEL</u>**

Pursuant to Local Rules 7.1 and 37.1 and Fed. R. Civ. P. 26 and 37, Plaintiff and Counterclaim Defendant DMO Norwood LLC, D/B/A Dan O'Brien Kia Norwood ("DMO") hereby opposes KIA America, Inc.'s ("KIA") Motion to Compel on the grounds that: (1) the document discovery KIA seeks is irrelevant to either party's claims or defenses, and not proportional to the needs of the case. Fed. R. Civ. P. 26(b); and (2) the interrogatory which KIA seeks to be supplemented has been sufficiently responded to by DMO. For these reasons, and as explained in detail *infra*, KIA's Motion to Compel should be denied as it relates to all VINs outside of the Sales Incentive and Desktop Audits, and on the grounds that DMO has sufficiently responded to the disputed interrogatory.

1

## BACKGROUND

DMO was a "motor vehicle dealer" located in Norwood, Massachusetts, as that term is defined under M.G.L. c. 93B, § 1.[1] It was authorized to sell and service new KIA products pursuant to a Dealer Sales and Service Agreement between DMO and KIA. DMO operated as "Dan O'Brien KIA of Norwood," prior to its sale.  KIA is a "Manufacturer" as that term is defined by M.G.L. c. 93B, § 1. Both DMO and KIA are subject to the Massachusetts "Dealer Bill of Rights" included in M.G.L. c. 93B, and their relationship is governed thereby.

This litigation arises from KIA's unfair acts and deceptive practices arising from its illegal auditing practices against DMO.  *See generally*, DMO Verified Complaint [Dkt. 1-2] In DMO's Verified Complaint, DMO alleges, inter alia, that KIA embarked on a campaign of illegal audits in violation of the Massachusetts Dealer Protection Act, M.G.L. c. 93B, §§ 3 and 9, after DMO's owner, Mr. Dan O'Brien, reported that a high level KIA executive, Mr. Joseph Vignone, had threatened him physically (Verified Complaint, ¶¶ 30-33) after learning that DMO intended to pull out of a KIA marketing program (Verified Complaint, ¶¶ 19-29).  DMO alleges that after Mr. O'Brien reported Mr. Vignone's behavior to KIA's human resources department, KIA began a campaign of illegal audits of DMO's sales practices which cumulated (culminated)? with KIA issuing a termination notice seeking to put DMO out of business.  *Id.*

On or about May 17, 2021, KIA sent DMO an audit notice indicating that it sought to audit 112 vehicles at DMO Norwood on June 8, 2021 (the "Sales Incentive Audit").[2]  On June 8,

---

[1] DMO sold essentially all of its intangible assets, furniture, fixtures and equipment and relinquished its right to operate as an authorized Kia dealer at the Norwood, MA location in November 2022, so it no longer is a motor vehicle dealer as that term is defined by M.G.L. c. 93B, but it was a motor vehicle dealer at the time the matters at issue took place.

[2] KIA subsequently issued similar audit letters to Mr. O'Brien's other KIA dealerships located in Concord, New Hampshire and North Hampton, New Hampshire.

2021, prior to informing anyone at DMO that he was on site to audit, KIA's auditor scanned every KIA vehicle on DMO's Norwood lot, which totaled approximately 200 vehicles. Verified Complaint, ¶ 44-46 [Dkt. 1-2]. Late in the day on June 8, 2021, KIA's auditor sent an email to DMO with a "preliminary list of items" he had purportedly observed that day and requested additional documentation from the dealership. DMO began the process of responding to KIA's various requests for documentation concerning the VINs subject to KIA's June 8th audit.

After many months of auditing and the exchange of voluminous documentation, on January 28, 2022, KIA sent DMO a Notice of Termination that had with it an Excel chart that included KIA's final audit results (the "Termination Notice"). The Termination Notice identified vehicles that KIA contended false or fraudulent retail delivery reports ("RDRs") were submitted by DMO, and were subject to chargeback. These same VINs and chargebacks formed the basis of KIA's Termination Notice, as KIA alleged that the vehicles were fraudulently reported as sold by DMO. In response to KIA's Termination Notice, DMO commenced this proceeding to enjoin termination and protest the Termination Notice and chargebacks. DMO maintains that it did not engage in fraud and there was not good cause to terminate DMO.

Shortly thereafter, KIA commenced a desk audit, pursuant to which it audited additional vehicles that had been reported as sold by DMO (the "Desktop Audit"). Counterclaim, ¶ 52. Based on that audit, KIA claimed that an additional 14 vehicles were identified by it that were allegedly improperly reported as retail sales. KIA has asserted a breach of contract claim alleging that DMO breached its obligations under the Dealer Agreement and Sales Policy "[b]y submitting false retail delivery reports to KIA and claiming and retaining sales incentive payments to which it was not entitled . . .." Counterclaim, ¶ 62. KIA is seeking chargebacks on these vehicles.

However, in addition to the vehicles audited in the Sales Incentive Audit and Desktop Audit, KIA is now using discovery to obtain sales documentation for the purposes of finding other deals upon to recoup (or "chargeback") sales incentives. In doing so, KIA is seeking documentation on vehicles which have never been part of any audit procedure, as required under the Massachusetts Dealer Protection Act, M.G.L. c 93B. KIA should not be permitted to seek discovery or obtain documents on vehicles which have not been subject to the auditing process. To hold otherwise will render Section 9 of M.G.L. c. 93B meaningless.

## THE DISPUTED DISCOVERY

DMO disputes that all of the requested document discovery is relevant to the claims and defenses at issue in this matter because of the shear breadth of the sought-after discovery given the relatively narrow scope of the Sales Incentive Audit and Desktop Audit results at issue. With respect to the Interrogatory request, DMO contends that it has adequately responded and, in any event, the interrogatory is unduly broad and overly burdensome.

Document Request No. 5 seeks "[a]ll documents concerning the reporting of vehicle sales to Kia for purposes of receiving incentives through any Kia Incentive Program." KIA agreed to narrow the scope of this Request admitting that it was overly broad. However, the current formulation of that Request remains overly broad and seeks irrelevant information as it pertains to the general submission of RDRs, not those RDRs that are at issue in the current dispute. KIA has statutory obligations when it comes to asserting claims and seeking the repayment of incentive or certain other payments made by manufacturers to dealers, and KIA's failure to follow those obligations precludes it from seeking general discovery here to assert those claims in the form of breach of contract as opposed to following the statutory procedures and remedies embodied in M.G.L. c. 93B.

4

Request No. 14 seeks "*[a]ll* of Kia Norwood's floorplan records, including all records of funding for Kia Norwood's acquisition of new Kia vehicles, Kia Norwood's reports to the floorplan lender of the sale of Kia vehicles, Kia Norwood's payment of interest, principal, and curtailment to its floorplan lender(s) for Kia vehicles, and all monthly account statements received from the floorplan lender(s)." It should be noted that Kia does not restrict Request No. 14 to documentation for those vehicles that were identified by Kia and presented to DMO as improperly RDR'd through the statutorily mandated audit process. Rather, the Request seeks "all" of the documents that are responsive going back to January 1, 2019, regardless of whether they relate to a vehicle that was the subject of a proper audit. Given the tenets of M.G.L. c. 93B, the requested discovery is not relevant because it relates to VINs that as a matter of law fall outside of the claims and defenses at issue in this action.

Similarly, Request No. 15 seeks "[r]ecords showing when each vehicle purchased by Kia Norwood entered into Kia Norwood's inventory and when each such vehicle left Kia Norwood's inventory." Once again, Request No. 15 is not limited to only those vehicles identified by KIA through the statutorily mandated audit procedure. Rather, KIA seeks these records for all vehicles that DMO purchased going back to January 1, 2019, which records are wholly irrelevant if those vehicles were not the subject of a properly conducted audit as contemplated by M.G.L. c. 93B.

Request No. 30 also improperly seeks "*[a]ll* general ledgers, *all* associated subsidiary ledgers, and *any* supporting documents for the balance sheet accounts from January 1, 2019 through the present, including any translation tables identifying the VINs associated with each vehicle stock number." Same as Request Nos. 14 and 15, Request No. 30 is in no way limited to the vehicles that were audited or were identified through the audit process as having possibly

been improperly reported as sold. Rather, Request No. 30 seeks "all" general ledgers and "all" subsidiary ledgers, regardless of whether those ledgers even include a single vehicle KIA identified on its audit reports as having been potentially improperly reported as sold and which forms the basis of KIA's claims. As such, this Request seeks scores of documents and information that is entirely irrelevant to the claims and defenses at issue in this matter, and the Motion should be denied as a result.

Finally, Interrogatory No. 10 asked DMO "[f]or each of the VINs referenced in paragraphs 56-57 of the Counterclaim, state the basis for your contention that the vehicle was properly reported to Kia as sold." However, DMO has already provided that information in numerous written exchanges between DMO and KIA during the course of the audits. Further, DMO has produced those exchanges as DMO_NORWOOD_000001 – DMO_NORWOOD_000182. It is perfectly legitimate for DMO to refer to writings in response to Interrogatories pursuant to Fed. R. Civ. P. 33, as it has and as it does in this instance as well.

## I. The Documents KIA Seeks To Compel Production Of Are Not Relevant To Any Claims Or Defenses.

KIA's claim is that DMO submitted false RDRs to claim and receive sales incentive payments to which DMO was not entitled, which constitutes a breach of the Dealer Agreement and Sales Policy governing the parties' relationship. In addition to the Dealer Agreement and Sales Policy, DMO's and KIA's relationship is governed by M.G.L. c. 93B, the Dealer Protection Act, which includes statutory requirements and restrictions that are directly relevant to claims KIA asserts and resolution of this Motion in DMO's favor as it relates to all VINs outside of the Sales Incentive and Desktop Audits.

The crux of KIA's counterclaim is that DMO submitted false RDRs and was improperly paid on resulting sale incentive submissions. While KIA attempts to couch its claims and

consequent entitlement to the requested discovery as a mere breach of contract encompassing all vehicles, identified by Vehicle Identification Number ("VIN"), sold by DMO going back to January 1, 2019, the breadth of the claim and requested discovery cannot stand as a matter of law. KIA is in essence seeking to employ a breach of contract claim to circumvent the mandatory audit and chargeback process and procedures included in M.G.L. c. 93B. *See* Motion, at 11 ("Kia, however, is not conducting an audit but rather discovery under the Federal Rules of Civil Procedure.").[3] However, because claims related to the VINs that were not part of the Sales Incentive or Desktop Audits are precluded by M.G.L. c. 93B as a result of KIA's failure to follow the statutorily mandated audit and chargeback processes, all information related thereto is not relevant, and the Motion should be denied as it relates to those such VINs.

>  M.G.L. c. 93B, § 15(a) provides that:
> 
> Any manufacturer, distributor or motor vehicle dealer who suffers any loss of money or property, real or personal, as a result of the use or employment by a manufacturer, distributor or motor vehicle dealer of an unfair method of competition or an unfair or deceptive act or practice as defined by this chapter, any act prohibited or declared unlawful by this chapter, or any rule or regulation adopted under this chapter, may bring an action in the superior court, or if applicable in the federal district court for the district of Massachusetts, for damages and equitable relief . . ..

M.G.L. c. 93B, § 15(e) goes on to provide that:

> The rights and remedies provided for in this chapter shall be the exclusive rights and remedies available under state law arising out of a violation of this chapter.

M.G.L. c. 93B, § 15 makes plain that Chapter 93B controls the rights and remedies for dealers and manufacturers related to any loss of money or property as a result of the use or employment by either of an unfair method of competition or an unfair or deceptive act or practice as defined

---

[3] It should be noted that KIA's continued reference to the NH Motor Vehicle Industry Board and its rulings in the pending termination matters in those administrative proceedings are completely irrelevant to these proceedings. Those proceedings are governed by New Hampshire's dealer statute and not subject to M.G.L. c. 93B.

7

by c. 93B, which is exactly the claim being asserted by KIA. Despite this undeniable fact, KIA is seeking to sidestep the clear mandates of M.G.L. c. 93B by asserting a breach of contract claim, when M.G.L. c. 93B provides KIA its exclusive remedy for violations of that chapter. *See* M.G.L. c. 93B, § 15(e); *see also*, *Crevier v. Town of Spencer*, 600 F. Supp. 2d 242, 265 (D. Mass. 2008) (holding that where an employee seeks to exercise a statutory right, and the statute provides a statutory remedy for a violation of that statutory right, the statutory remedy preempts common law claims); *see also Green v. Wyman-Gordon Co.*, 422 Mass. 551, 557-558 (1996) (holding that where a statute applies, its comprehensive remedial scheme is exclusive in the absence of language therein to the contrary, as "[t]o permit such duplication of remedies would allow claimants to bypass the procedural prerequisites defined by the Legislature . . . crippling the effectiveness of this specific statutory remedy . . ..") (internal citations omitted). KIA cannot dodge its statutory requirements and prerequisites by asserting general, all-encompassing breach of contract claims to conduct an ad hoc audit through the discovery process and seek the repayment of sales incentive claims when such actions are directly controlled by statute.

In fact, M.G.L. c. 93B, § 9 expressly addresses auditing and seeking chargebacks of allegedly improper sales incentive claims and resulting payments. In that regard, M.G.L. c. 93B, § 9(c) and (e), which are specific to sales incentive payments, provide that:

> (c) Every manufacturer or distributor shall retain the right to audit claims submitted by a motor vehicle dealer and paid by the manufacturer or distributor for warranty service, parts recall service, and sales incentive, bonus, or other claims relating to the sale of new motor vehicles or services, for 1 year after the date on which a claim is paid or the end of any program period, whichever is later, and to charge back any amounts paid on claims identified in subsections (d) and (e). If there is evidence of fraud or if there has been fraudulent concealment, said manufacturer or distributor shall have a right to audit records for periods exceeding 1 year.
> . . .

> (e) A sales incentive, bonus or comparable claim relating to the sale of new motor vehicles or services submitted by a motor vehicle dealer and paid by the manufacturer or distributor may be charged back to the motor vehicle dealer only if the claim was fraudulent or false, the sales were not made, the sales were not timely, or the motor vehicle dealer failed to comply with the reasonable written requirements of the manufacturer or distributor in effect at the time that the claim was presented for payment.
>
> A manufacturer or distributor shall not chargeback a motor vehicle dealer subsequent to the payment of a claim unless a representative of the manufacturer or distributor first meets in person or by video or teleconference with an officer or employee of the dealer or a dealer-designated representative.

Here, KIA's common law breach of contract claim against DMO is based upon industry-specific activities which are expressly governed by Chapter 93B – *i.e.*, a manufacturer's ability to audit incentive payment and assert chargebacks for allegedly improperly submitted RDRs and resulting incentive payment claims, which is expressly governed by M.G.L. c. 93B, § 9. Section 9 outlines all of the statutory prerequisites which must be fulfilled prior to seeking the return of any money from a dealer for a sales incentive claim. For example, prior to taking a chargeback for any falsely submitted incentive claim, a manufacturer must:

- Conduct an audit "in a reasonable time" using their best efforts "not to unreasonably with the ongoing business of the dealer"; M.G.L. c. 93B, § 9 (f);

- Meet with the motor vehicle dealer and at such meeting "provide a detailed explanation, with supporting documentation, as to the basis for *each of the claims* for which the manufacturer or distributor proposed a chargeback to the dealer and provide a written statement containing the basis for which the motor vehicle dealer was selected for audit or review." M.G.L. c. 93B, § 9 (e) (emphasis added);

- Compile the results of the audit in writing and provide a copy to the dealer. M.G.L. c. 93B, § 9 (h).

Section 9(b)(4) plainly states that an audit is the first step to be taken when a manufacturer wishes to chargeback a dealer for "fraudulent or false" sales incentive claims. *Id.* Here, the Counterclaims fail to allege (and in fact, KIA cannot allege) that it followed the statutory audit

procedures set forth in Section 9 for any vehicles or related VINs outside of the Sales Incentive Audit or Desktop Audit, so discovery related to all such vehicles should be denied.

The undisputed material facts in this matter show that KIA audited certain claims as part of the Sales Incentive Audit and the Desktop Audit. No other audits have been conducted by KIA related to VINs outside of the Sales Incentive Audit and Desktop Audit. **As such, the only VINs that could be relevant to KIA's breach of contract claim, which is essentially a claim for chargebacks related to KIA's findings in the Sales Incentive Audit and Desktop Audit, are the VINs that were in fact audited by KIA**. All requests for documents related to VINs other than those that were the subject of the Sales Incentive Audit or Desktop Audit are not "relevant to any party's claim or defense and proportional to the needs ot he case . . .." Fed. R. Civ. P. 26(b).

Request No. 5 as narrowed by KIA is overly broad as it seeks irrelevant documents. Specifically, KIA states that it seeks documents concerning "(1) whether the criteria for submitting RDR under Kia's Sales Policy are satisfied . . .." Motion, at 5. This is exactly what the audit process is intended to cover—instances where KIA questions whether it was proper for a specific RDR to be submitted and to seek documents and information from DMO to confirm same. Request No. 5 as it relates to all VINs other than those that were the subject of the Sales Incentive Audit or the Desktop Audit is an improper attempt to perform an audit outside of the parameters of M.G.L. c. 93B, so the Motion should be denied as it relates to Request No. 5 for all VINs outside of the Sales Incentive Audit or Desktop Audit.[4]

---

[4] DMO has already produced extensive non-privileged documentation concerning the VINs which were the subject of both the Sales Incentive Audit and the Desktop Audit, including all sales documents available and searching key custodian emails for the VINs which were audited.

10

Request No. 14 seeks all floorplan records going back to January 1, 2019. KIA states that it seeks such records to do a comparison of the floorplan records to RDRs submitted by DMO to KIA to determine if the vehicles came off the floorplan at the time their RDRs were submitted. Request No. 14 is not limited to the VINs that were audited as part of the Sales Incentive Audit or Desktop Audit, but rather seeks all floorplan records for all VINs for the lifetime of the store. Once more, this is an improper attempt by KIA to sidestep the mandatory audit and chargeback processes embodied in M.G.L. c. 93B, § 9, whereby it intends to employ a makeshift audit through the discovery process to assert claims and seek the repayment of incentives that never went through the statutory process and procedure spelled out by the legislature for the recovery by a manufacturer of such claims. Because KIA is not entitled to recover claims related to any sales incentive payments that were not audited in accordance with M.G.L. c. 93B, § 9, discovery and floorplan records related to all VINs that were not the subject of the Sales Incentive or Desktop Audit should be denied as irrelevant.

Request No. 15 seeks inventory records going back to January 1, 2019 showing when all new vehicles, over the lifetime of DMO's existence, entered and exited its internal inventory records. KIA seeks these records for the same reason as the records sought pursuant to Request No. 14 — that is, to verify whether the records indicate the vehicles were sold when reported as such by DMO. Once more, this is a blatant attempt by KIA to sidestep the statutory mandates of M.G.L. c. 93B to audit, meet and confer with the dealer regarding the results and then assert chargebacks for whatever claims are not resolved. KIA flat out admits that it is its intention to employ the Federal Rules of Civil Procedure to avoid the clear statutory mandates of M.G.L. c. 93B, which 93B itself provides cannot occur. *See* Counterclaims, ¶ 62; M.G.L. c. 93B, § 15(e) ("The rights and remedies provided for in this chapter *shall be the exclusive rights and remedies*

11

*available under state law arising out of a violation of this chapter. Notwithstanding any term or provision of a franchise agreement to the contrary: (1) the laws of the commonwealth shall govern the interpretation of the franchise agreement of a motor vehicle dealer located in the commonwealth and the performance of the parties thereunder . . ..*") (emphasis added).

Despite the plain language of Section 9, KIA improperly seeks to employ a common law claim for breach of contract to take discovery and recover claims which are expressly governed by Chapter 93B's statutorily mandated audit and chargeback process. The undisputed facts are that KIA failed to follow the audit process for all VINs other than those included in the Sales Incentive and Desktop Audits. Because claims related to VINs outside of the Sales Incentive Audit and Desktop Audit are precluded as a result of KIA's failure to follow the process laid out in Section 9, all discovery related to those VINs is not relevant to either party's claims or defenses, so the Motion should be denied with respect to all such documents.

## II. DMO Has Already Provided An Adequate Response To Interrogatory No. 10 And Should Not Be Compelled To Respond Further.

KIA's Motion also seeks to compel DMO to respond further to Interrogatory No. 10. Interrogatory No. 10 asks DMO "[f]or each of the VINs referenced in paragraphs 56-57 of the Counterclaim, state the basis for your contention that the vehicle was properly reported to Kia as sold." Essentially, KIA is asking DMO to respond to 23 separate inquiries, as there are 23 VINs cited by KIA in paragraphs 56 and 57 of the Counterclaim. Paragraph 56 references the following 8 VINs, all of which of which KIA contends were falsely reported as "sold" by DMO to KIA and subject to KIA's original June 2021 audit (hereafter, collectively the "June Audit VINs":

1) KNDPMCAC0L7836397
2) KNDPNCAC5M7885500
3) KNDPRCA66M7920074

12

      4)      KNDPMCAC5M7935718
      5)      3KPF44AC5ME332656
      6)      KNDPMCAC6M7935601
      7)      KNAE15LA7M6093202
      8)      KNAE15LA9M6091631

Similarly, Paragraph 57 sets forth the following list of 15 VINS, which KIA claims were improperly reported by DMO under a "Retail" designation, and all of which were the subject of KIA's second "Desktop Audit" of the dealership's sales (hereafter, collectively the "Desktop Audit VINs"):

      1)      3KPF24AD8LE231267
      2)      3KPF24AD2LE262319
      3)      3KPF24ADXME281914
      4)      KNDPMCACOL7810463
      5)      KNDPMCACOL7816568
      6)      KNDPMCAC2L7810755
      7)      KNDPMCAC2L7812361
      8)      KNOPMCAC4L7810367
      9)      KNDPMCAC4L7810546
    10)    KNOPMCAC5L7809129
    11)    KNDPMCAC817816026
    12)    KNDPMCAC917816195
    13)    KNDPMCAC117809354
    14)    KNOPMCAC4L7823751
    15)    KNDPMCAC7L7836381

*See generally*, KIA's Counterclaim, ¶¶ 56-57. In responding to this Interrogatory, DMO objected and answered as follows:

**Interrogatory No. 10**

For each of the VINs referenced in paragraphs 56-57 of the Counterclaim, state the basis for your contention that the vehicle was properly reported to Kia as sold.

**Answer No. 10**

**Objections:**    DMO objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome.

**Response:**    Subject to and without waiver of the foregoing General Objections and Specific Objections, DMO refers KIA to the documents bates stamped as

> DMO2_017055 – DMO2_017259 in response to this interrogatory as it relates to the VINs referenced in paragraph 56.
>
> Subject to and without waiver of the foregoing General Objections and Specific Objections, DMO responds that the VINs referenced in paragraph 57 were classified as "retail" sales when they were RDR'd as being sold to an O'Brien Non-Kia Dealership with Mr. Tom Kuhn listed as the contact person because at the time it was DMO's understanding that there was no other applicable option in K-Dealer to report the vehicle as sold to another non-Kia Dealership. Further responding, Kia always had all relevant information on these vehicle sales to advise DMO that its reporting of the vehicles as sold was not proper, but that did not occur until this audit.

*See* DMO's Answers to Interrogatories, attached as Exhibit 3 to Mendelsohn Aff. [Doc. 98-4].

In its demand letter for further supplementation, and in this present Motion, KIA claims that DMO is required to state how DMO has complied with the KIA Sales Policy for each of these 23 VINs, including "whether all of the requirements of Section 1.3 (C) of the KIA Sales Policy were satisfied as to each vehicle." *See* "KIA Deficiency Letter" dated April 24, 2023, which was filed in connection with KIA's Motion to Compel [Dkt. 98-8]. DMO's counsel responded to this expanded demand in writing on May 5, 2023. A copy of DMO's Response Letter of May 5, 2023 was previously filed with KIA's Motion [Dkt. 98-10]. In that Response Letter, DMO further identified the specific documents which support DMO's position that each vehicle was properly reported. [DMO Response, Dkt. 98-10]. In that regard, DMO's counsel responded as follows with further information identifying where in the documents KIA could ascertain the requested information:

> The first list of 8 VINS contained in Paragraph 56 of the Counterclaim consists of deals which Kia believes were falsely reported as sold to Kia. These 8 vehicles were identified in the Final Audit Results from the original June 2021 audit. DMO has provided to Kia a detailed explanation for these deals on numerous occasions including, but not limited to, Attorney Kevin Buckley's letter to Mr. Vaughn dated July 18, 2022 (emailed on July 19, 2022), which provided both explanations and documents concerning these vehicles. In addition, the VINS for these 8 vehicles (and DMO's related vehicle stock numbers, i.e., the last 6 digits of the VINs) were used as search terms to find documents responsive to Kia's

14

> prior document requests. DMO has produced all relevant documentation that it can reasonably locate related to each of these 8 vehicles. To the extent that Kia wishes to isolate documents related to these VINS, it can simply search its own Relativity portal for the VINS and stock numbers for each vehicle. No further supplementation to DMO's interrogatory responses is needed with respect to these vehicles.
>
> The second list consists of 15 VINs (Counterclaim Paragraph 57) for vehicles which were all RDR'd to KIA on 11/30/2020 and identified Tom Kuhn as the contact person for the purchaser. All were sold under the "Retail" incentive program designation. These vehicles were identified in the final results of KIA's second, "desktop audit" that was conducted for DMO Norwood in 2022. KIA contends that these vehicles should not have been sold using the Retail program designation given that the purchaser was a dealership business that was going to resell the cars. They contend that the proper designation would have been to use the "Dealer Based Fleet Program (DBFLT)." However, as stated numerous times by DMO to Kia, there is no evidence that the DBFLT program was actually in effect and available to use (or that dealers were properly informed on when to use it) in November 2020.
>
> DMO's explanations as to why these 15 vehicles were properly RDR'd have been set forth in writing on numerous occasions to Kia as these vehicles were continuously discussed by the parties during the desktop audit. Specifically, in addition to the documents cited in DMO's document responses, DMO refers KIA to the following letters which specifically discuss these vehicles:
>
> 1. Letter from Kevin Buckley to James Vaugh dated July 18, 2022 (with zip file of data)
> 2. Letter from Tom Vangel to John Sullivan dated August 5, 2022
> 3. Letter from James Radke to John Sullivan dated November 21, 2022
> 4. Letter from James Radke to John Sullivan dated January 19, 2023
>
> Many of these letters attached data which has already been produced in this litigation. However, to err on the side of completeness, DMO will supplement its document production to re-produce these letters (and the corresponding Kia communications) concerning the desktop audit involving these VINS.

*See* DMO Response letter [Dkt. 98-10]. DMO subsequently produced copies of these documents with Bates numbered DMO_NORWOOD_000001 – DMO_NORWOOD_000182. Copies of these documents stamped DMO_NORWOOD_000001 – DMO_NORWOOD_000182 are attached as <u>Exhibit 1</u> to the accompanying Affidavit of Sara Judge. However, it should be noted

15

that all of the documents supplemented were at all times within KIA's possession, custody and control because the letters, enclosures and zip files of data were exchanged by the parties during the ordinary course of business during KIA's audits. *Id.*

KIA continues to claim that the documents are deficient with respect to responding to the Interrogatory. KIA's claims of deficiencies are inappropriate for several reasons.

First, KIA's Interrogatory No. 10 is overly broad, unduly burdensome and the subparts exceed the number of interrogatories allowed under Rule 33, which limits the number of interrogatories to "no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). Here, KIA is asking DMO to state "whether all of the requirements of Section 1.3 (C) of the KIA Sales Policy were satisfied as to each vehicle" (KIA Motion, pg. 11.) The KIA Sales Policy is 29-page document purporting to outline all of KIA's rules which govern a dealer's reporting of retail sales of KIA vehicles to KIA. (A copy of the KIA Sales Policy is annexed as Exhibit 2 to the accompanying Judge Aff.) Section 1.3(C) of the Sales Policy sets forth 6 different criteria for a vehicle to be eligible for payment of a sales incentive. *Id.* As such, KIA's Interrogatory No. 10 is really asking 6 different subpart questions for 23 different VINs, which would be 138 separate subparts to answer. This is overly broad, unduly burdensome and exceeds the permissible scope of discovery.

Second, KIA's Motion should be denied because DMO is allowed to refer KIA to its document production in response to Interrogatories. Federal Rules of Civil Procedure Rule 33(d) allows a party responding to an interrogatory to refer the interrogating party to records, if the answer may be determined by examining those records and if the burden of ascertaining the answer will be substantially the same for either party. *See* Fed. R. Civ. P. 33(d); *see also, United States ex. Rel. Martino-Fleming v. South Bay Health Center, Inc., et. al.*, 332 F.R.D. 1, 2

16

(D. Mass. 2019) (holding that the defendant had produced sufficient documents to respond to the interrogatory and that the defendant was not required to identify the specific information that each Bates numbered document contained). Specifically, Rule 33(d) provides:

> (d) **Option to Produce Business Records**. If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:
>
>> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and
>>
>> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

*See* Fed. R. Civ. P. 33(d).

Here, DMO has produced ample documentation explaining DMO's position with respect to the disputed VINs. For example, with respect to the VINs cited in Paragraph 57 concerning the "Desktop Audit VINs," DMO's counsel wrote to KIA on July 19, 2022 providing DMO's explanation as to why the sales were properly reported, and he also provided copies of the motor vehicle purchase contracts and certain "RDR screens" (printouts from KIA's dealer system) showing the identity of the customer, the customer's name, business address, date of sale, sale price, and the date it was reported to KIA as sold. *See* Exhibit 1, DMO_NORWOOD_000016 to 000107. On November 21, 2022, DMO's legal counsel further responded to KIA's inquiries about these disputed VINS. *See* Exhibit 1, DMO_NORWOOD_000125 to 000156. Then again, on January 19, 2023, DMO's legal counsel sent KIA's counsel another response which sets forth DMO's position on why the disputed VINs satisfy the KIA Sales Policy, and attached

more information upon which DMO relies.  *See* Exhibit 1, DMO_NORWOOD_000169 to 000182.

These documents allow KIA to ascertain DMO's position on how these VINs have satisfied the KIA Sales Policy, and KIA has had these documents since the date the correspondence was original sent to KIA.  KIA can use these documents (as well as other documents produced in discovery by DMO) to determine the answers to Interrogatory No. 10.  DMO has complied with its obligations under Rule 33(d) and no further response is required.

**III.    KIA Is Not Entitled to Attorneys' Fees or Costs.**

KIA's request for attorneys' fees and costs must also be denied.  KIA is abusing the litigation process as a "run around" to its audit obligations under M.G.L. c. 93B, § 9.  KIA cannot and should not be permitted to use a "breach of contract" claim to audit DMO's sales records in a manner which exceeds the permissible scope under Massachusetts law.  Similarly, DMO has responded repeatedly and on numerous occasions to KIA's inquiry on VINs, including in 3 separate letters by its legal counsel which specifically address KIA's accusations of non-compliance with the Sales Policy. KIA's discovery is overly broad, unduly burdensome, and DMO has acted in good faith in responding to the same.  For this reason, KIA's Motion should be denied in its entirety.

## CONCLUSION

For the reasons set forth herein, DMO respectfully requests that this Court deny KIA's Motion to Compel in its entirety.

Respectfully submitted,

**PLAINTIFF,**

**DMO NORWOOD LLC,
d/b/a Dan O'Brien KIA Norwood,**

By its attorneys,

*/s/ Gregory S. Paonessa*
Paul Marshall Harris (BBO #223500)
pharris@burnslev.com
Sara Decatur Judge (BBO #669104)
sjudge@burnslev.com
Gregory S. Paonessa (BBO #691216)
gpaonessa@burnslev.com
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
Dated: May 31, 2023    Tel: (617) 345-3000

## **CERTIFICATE OF SERVICE**

I, Gregory S. Paonessa, Esq. certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

    */s/ Gregory S. Paonessa*
Gregory S. Paonessa

4867-7083-4791.1