```
            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| DMO NORWOOD LLC d/b/a Dan O'Brien Kia Norwood,<br><br>    Plaintiff,<br><br>v.<br><br>KIA AMERICA, INC.,<br><br>    Defendant. | No. 22-cv-10470-ADB |

**ORDER ON DEFENDANT'S MOTION TO COMPEL**

Cabell, U.S.M.J.

## I. INTRODUCTION

This action arises from the dissolution of a relationship between DMO Norwood LLC ("the plaintiff" or "DMO Norwood"), a motor vehicle dealership, and Kia America, Inc. ("the defendant" or "Kia"), a motor vehicle distributor, following Kia's audits of the plaintiff's compliance with Kia's sales incentive programs. The plaintiff asserts that the defendant conducted these audits and terminated the parties' Dealer Agreement in retaliation for the plaintiff's withdrawal from a voluntary marketing program. The defendant, via a counterclaim for breach of contract, asserts that the plaintiff breached the Dealer Agreement by improperly reporting certain vehicles as sold and thereby collecting unearned sales incentives. With an eye toward proving its counterclaim,

the defendant moves to compel the plaintiff to produce documents and respond to an interrogatory concerning its vehicle inventory and sales reporting; the plaintiff opposes. (Dkt. Nos. 97, 100). For the following reasons, the defendant's motion to compel is allowed.

## II. RELEVANT BACKGROUND

On or about February 1, 2019, the parties entered into a Kia Dealer Sales and Service Agreement, whereby the plaintiff began operating as an authorized Kia dealer. (Dkt. No. 1-2, Verified Complaint, ¶ 6). The plaintiff was one of three Kia dealerships solely owned by Daniel O'Brien, with the others located in Concord, New Hampshire ("DMO Concord") and North Hampton, New Hampshire. (*Id.* at ¶ 9). O'Brien also owned and operated three non-Kia dealerships in Massachusetts and New Hampshire. (*Id.* at ¶ 10).

As an authorized Kia dealer, the plaintiff was able to participate in the defendant's sales incentives programs. (*Id.* at ¶ 34). Broadly speaking, these programs provided that the defendant would make payments to dealers for certain qualifying sales transactions reported by said dealers. (*Id.* at ¶ 35). The defendant's sales policy further provided that the defendant could "charge back" any incentive payments made based on "the submission of inaccurate, false or fraudulent information or the failure by [a] dealer to notify [Kia] in writing of any fact that renders a prior submission inaccurate, false or fraudulent." (*Id.* at ¶ 37).

The defendant reserved the right to audit the dealer's compliance with its sales incentive programs. (*Id.* at ¶ 36).

On or about May 15, 2021, the defendant notified the plaintiff of its intention to conduct an audit "of certain sales and incentive claims made and paid to DMO Norwood and DMO Concord." (Dkt. No. 80, Counterclaim, ¶ 33). An on-site audit of DMO Norwood was scheduled for June 8, 2021.[1] (*Id.*). Allegedly, in the weeks between May 15 and June 8, the plaintiff "launched an urgent but only partially successful effort to move a substantial number of Kia vehicles" between itself and other affiliated dealerships "and to sell off over 100 Kia vehicles to a wholesaler." (*Id.* at ¶ 34). The defendant maintains that the plaintiff engaged in this flurry of activity

> in order to conceal from Kia's auditor that the [plaintiff and affiliated Kia dealerships] still had dozens of vehicles in inventory that they had previously reported to Kia as retail sales and for which they had received tens of thousands of dollars in incentive payments to which they were not entitled.

(*Id.*). The defendant purports to describe various written communications among the affiliated dealerships detailing the alleged concealment attempt. (*Id.* at ¶¶ 35-46).

Notwithstanding the plaintiff's alleged efforts, the June 8 audit revealed "that there were 22 Kia vehicles on the

---

[1] The defendant's counterclaim indicates that the DMO Norwood and DMO Concord audits took place "on January 8-10, 2021." (Dkt. No. 80, ¶ 47). The court presumes that this is an error given that the defendant first notified the plaintiff of the audits in May 2021.

3

[plaintiff's] lot that had previously been reported as retail sales by DMO Norwood and eight (8) vehicles that had previously been reported as retail sales by DMO Concord." (*Id.* at ¶ 48). The defendant alleges that there are likely more such vehicles that it could not detect through the audit because the plaintiff moved them off its lot prior to June 8. (*Id.* at ¶ 51). After the audit, the defendant requested "complete documentation" for the reported sales of these vehicles. (*Id.* at ¶ 50). Reportedly, the documentation provided by the plaintiff in response was not "complete and/or satisfactory." (*Id.*).

The defendant subsequently conducted a "desk audit" of DMO Norwood, through which it allegedly identified 14 more vehicles improperly reported as sold for sales incentive purposes. (*Id.* at ¶¶ 52-55). On January 28, 2022, the defendant notified the plaintiff that it was terminating the parties' Dealer Agreement based on the plaintiff's submission of false sales reporting information. (Dkt. No. 1-2, ¶ 75). The plaintiff maintains that any discrepancies between its reported sales and actual sales were the result of good-faith errors and that the defendant used this issue as a pretext to terminate the Dealer Agreement in bad faith.

In March 2022, the plaintiff brought the present action against Kia in state court and Kia timely removed the matter to federal court. (Dkt. No. 1-2; Notice of Removal). Several months later, the defendant sought leave to file seven counterclaims

4

against the plaintiff, O'Brien, and O'Brien's New Hampshire Kia dealerships. (Dkt. No. 52; Dkt. No. 53). The court disallowed the defendant from pursuing most of the counterclaims or adding additional parties to the action but did grant leave for the defendant to assert a breach of contract counterclaim, which the defendant has since filed, and the plaintiff has answered. (Dkt. Nos. 74, 80, 81).

## III. **LEGAL STANDARD**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Whether discovery is proportional depends on "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* "If a party fails to respond to requests for production of documents or interrogatories, the party seeking discovery may move to compel production of the requested information." *Close v. Account Resolution Servs.*, 557 F. Supp. 3d 247, 250 (D. Mass. 2021) (citing Fed. R. Civ. P. 37(a)(3)). The party moving to compel "bears the initial burden of showing the relevance of the information sought." *Douglas v. EF Educ. First Int'l, Ltd.*, --- F.R.D. ---, 2023 WL 3481479, at *2

(D. Mass. 2023) (internal quotation omitted). If the moving party makes a showing of relevance, the burden shifts to the objecting party to show that a discovery request is improper. *Close*, 557 F. Supp. 3d at 250.

## IV. DISCUSSION

Kia seeks an order compelling the plaintiff to respond to four requests for production of documents (RFPs) and one interrogatory. For ease of reference, each such RFP and interrogatory is set out below.

RFP No. 5 seeks "[a]ll documents concerning the reporting of vehicle sales to Kia for purposes of receiving incentives through any Kia Incentive Programs." (Dkt. No. 98-2, p. 7).[2] RFP No. 14 requests

> [a]ll of Kia Norwood's[3] floorplan records, including all records of funding for Kia Norwood's acquisition of new Kia vehicles, Kia Norwood's reports to the floorplan lender[4] of the sale of Kia vehicles, Kia Norwood's

---

[2] After meeting and conferring with the plaintiff, the defendant narrowed this request to "documents related to Plaintiff's claim that the false reporting was the result of good faith errors." (Dkt. No. 98, p. 4). Specifically, the defendant "narrow[ed] the request to documents:
  1. Concerning whether the criteria for submitting an RDR [Retail Delivery Report] under Kia's Sales Policy are satisfied;
  2. Concerning whether it is proper to submit an RDR where there is no agreement or purchase order signed by the customer;
  3. Concerning the application of the Rule of Four in Kia's Sales Policy; and
  4. Reflecting any DMO Norwood employees' knowledge of whether the submission of, or failure to unwind, any RDR violated Kia's Sales Policy."
(Dkt. No. 98-9, p. 2). The court considers RFP No. 5 subject to this limitation.

[3] The court understands "Kia Norwood" to refer to the plaintiff, DMO Norwood.

[4] A floorplan lender is a financial institution that lends funds to a dealership to finance the dealership's purchase of new vehicles. (Dkt. No. 98, p. 2).

>   payments of interest, principal, and curtailment to its
>   floorplan lender(s) for Kia vehicles, and all monthly
>   account statements received from the floorplan
>   lender(s).

(*Id.* at p. 13). RFP No. 15 calls for "[r]ecords showing when each vehicle purchased by Kia Norwood entered into Kia Norwood's inventory and when each such vehicle left Kia Norwood's inventory." (*Id.* at p. 14). Finally, RFP No. 30 solicits "[a]ll general ledgers, all associated subsidiary ledgers, and any supporting documents for the balance sheet accounts from January 1, 2019[,] through the present, including any translation tables identifying the VINs[5] associated with each vehicle stock number." (Dkt. No. 98-3, p. 4). The disputed interrogatory, Interrogatory No. 10, directs the plaintiff to, "[f]or each of the VINs referenced in paragraphs 56-57 of the Counterclaim, state the basis for your contention that the vehicle was properly reported to Kia as sold." (Dkt. No. 98-4, p. 5).

Kia argues that each of these discovery requests is relevant to its counterclaim. The documents requested through RFP No. 14 and RFP No. 15 will reflect whether and for how long the plaintiff retained vehicles in its inventory after reporting them as sold for sales incentive purposes, while the documents contemplated by

---

Typically, once the dealer sells a financed vehicle, it must repay the floorplan lender within a few days. (*Id.*).

[5] VIN stands for "Vehicle Identification Number," a unique identifier assigned to every motor vehicle.

RFP No. 30 will enable the defendant to compare the plaintiff's internal sales reporting with the sales it reported to the defendant. Relatedly, the documents sought through RFP No. 5 and the response to Interrogatory No. 10 would be relevant to testing the plaintiff's defense that any improperly reported sales were the product of honest mistakes. The court agrees that each of these requests is facially relevant, and so the burden shifts to the plaintiff to show that the requests are nonetheless irrelevant or otherwise improper. *See Close*, 557 F. Supp. 3d at 250. The court now turns to the plaintiff's arguments.

### A. Document Requests

The plaintiff argues that Kia's RFPs seek information that is not relevant to the extent they seek information about vehicles other than those identified through the onsite and desk audits. The plaintiff bases this argument on its reading of M.G.L. c. 93B ("Chapter 93B"), which governs the relationship between automobile manufacturers, distributors, and dealers and, among other things, establishes a procedure through which a distributor may audit a dealer's submitted sales incentive claims and "charge back" incentives paid on claims that are determined to be improper, subject to certain limitations. M.G.L. c. 93B, § 9(c)-(h). The plaintiff notes that an exclusivity provision in Chapter 93B concurrently provides that "[t]he rights and remedies provided for in this chapter shall be the exclusive rights and remedies

8

available under state law arising out of a violation of this chapter." M.G.L. c. 93B, § 15(e). Such violations include "the use of employment by a . . . motor vehicle dealer of . . . an unfair or deceptive act or practice as defined by this chapter." M.G.L. c. 93B, § 15(a).

Putting these provisions together, the plaintiff argues that Kia's rights and remedies are limited to those provided in Chapter 93B and it therefore may only obtain information about alleged false sales incentive claims through the audit procedure laid out in Section 9. Because Kia has only conducted two such audits, so the plaintiff argues, the scope of its counterclaim is necessarily limited to the alleged false claims identified by those audits, and it cannot now use discovery as an "end run" around the audit requirement to identify other false claims. This argument does not persuade.

First, to the extent the plaintiff is heard to suggest that Chapter 93B is the defendant's sole recourse for seeking redress for the plaintiff's alleged violation of Kia's sales incentive programs, and thus preempts the defendant's common law counterclaim, the argument fails because the court has previously ruled that the defendant can assert such a counterclaim. (Dkt. No. 74, p. 8). In so ruling, the court noted that it would not "deny Kia leave to add this counterclaim on this ground, since 'Massachusetts courts do not appear to have resolved whether a

9

dealer is preempted from bringing related common law claims in addition to c[h]. 93B claims.'"  (*Id.* at p. 8 n.4) (quoting *Aston Martin Lagonda of N. Am., Inc. v. Lotus Motorsports, Inc.*, Civil Action No. 13-11213-DJC, 2014 WL 1092864, at *5 (D. Mass. Mar. 18, 2014)) (alteration in original).  The plaintiff in any event offers no authority other than the text of Chapter 93B itself to suggest that the statute precludes common law breach claims, and the lean authority the court is aware contrarily suggests that the defendant's counterclaim is legally viable.  *See Aston Martin Lagonda*, 2014 WL 1092864, at *5 (noting "cases in other courts applying Massachusetts law [that] involved plaintiffs pleading both c. 93B and common law claims").[6]

Moreover, the plaintiffs have offered no authority for the more limited proposition that, assuming the defendant has pled a valid breach claim, the claim (and corresponding discovery) must be limited to the sales incentive payments the defendant made for vehicles included in the two audits.  Chapter 93B provides distributors with the right to audit sales incentive claims but it does not in any way link the audit process to a distributor's rights in litigation or bear on the appropriate scope of discovery.  *See* M.G.L. c. 93B, § 9.  Similarly, the statute's exclusivity

---

[6] Indeed, the plaintiff's own complaint in this case asserts common law claims against the defendant, including a claim for breach of contract, undermining any suggestion that Chapter 93B provides the sole basis for litigating disputes over dealers' sales programs.

10

provision in section 15(e) contains no language purporting to limit the scope of a litigant's right to discovery. *See* M.G.L. c. 93B, § 15(e).[7]

Furthermore, the balance of equities here strongly favors allowing the defendant to discover information about vehicles not included in the audits. The defendant asserts that the plaintiff took certain steps to remove some vehicles improperly reported as sold from its lot prior to the June 8 audit. It would make little sense to say that the defendant is precluded from obtaining discovery about those vehicles because they were consequently not included in the audit. This is especially true where it appears the defendant only became aware of this alleged concealment through review of discovery it received in this suit.

In sum, the court finds that the documents covered by the RFPs are facially relevant to the defendant's counterclaim, and no provision of Chapter 93B limits the scope of what the defendant may discover to the two audits at issue. As there is no assertion that producing the documents would impose an undue burden on the plaintiff, the plaintiff shall produce the requested documents.

---

[7] Indeed, the statute elsewhere expressly references and incorporates in part the Federal Rules of Civil Procedure. M.G.L. c. 93B, § 15(a) (conditioning grant of equitable relief to party filing suit on meeting "all other customary standards governing the issuance of injunctive relief in accordance with Massachusetts or Federal Rules of Civil Procedure, as applicable"). This suggests that the Federal Rules of Civil Procedure, including the rules on discovery, apply as normal to dealer-distributor disputes.

### B. Interrogatory

The plaintiff raises two arguments as to why it should not be compelled to further respond to Interrogatory No. 10: (1) the interrogatory is impermissibly broad, and thus responding to it poses an undue burden; and (2) the plaintiff is entitled to respond by identifying documents pursuant to Federal Rule of Civil Procedure 33(d). As explained below, neither argument persuades.

Interrogatory No. 10 concerns 23 vehicles that the defendant alleges the plaintiff improperly reported as retail sales. The plaintiff contends that explaining how each of these 23 sales satisfied each of the six criteria set out in the Kia Sales Policy amounts to 138 individual inquiries, far surpassing the maximum number of interrogatories allowed to each party. *See* Fed. R. Civ. P. 33(a)(1) ("Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts."). This attempt to multiply one interrogatory into 138 is unavailing. Just because Interrogatory No. 10 concerns more than one vehicle does not mean that each vehicle constitutes a "discrete subpart." *Id.* Similarly, the fact that the Sales Policy contains six criteria for a properly reported sale does not mean that each criterion presents an individual inquiry as to each vehicle. Nothing makes this clearer than the response the plaintiff has already provided

12

to Interrogatory No. 10, in which it gave one single-paragraph explanation for its reporting activity as to 15 of the 23 vehicles. (Dkt. No. 97-4, p. 5). In short, Interrogatory No. 10 does not conceal 138 discrete questions within itself, and so the court will not deny the motion to compel on that basis.

Next, the plaintiff contends that it can properly respond to Interrogatory No. 10 by referring to documents it has already produced. Specifically, the plaintiff contends that its justifications as to the challenged vehicles are reflected in documents from the audit process that the defendant already possesses, and so the defendant can simply review those documents. The plaintiff is correct in that,

> [i]f the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records . . . , and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to locate and identify them as readily as the responding party could.

Fed. R. Civ. P. 33(d). However, here the defendant cannot fairly be expected to answer the interrogatory itself by poring over the documents the plaintiff has identified. Interrogatory No. 10 asks the plaintiff to explain its contention that each of the identified vehicles was properly reported as a retail sale. In essence, it calls for the plaintiff to articulate its defense(s) to the defendant's claim that the sales were improperly reported. The

13

plaintiff is the only party that can articulate its own legal theories. Even if the defendant could review the audit records and infer what the plaintiff's defenses could be or likely would be, that would not substitute for the plaintiff stating its defenses affirmatively and under oath.[8] *See* Fed. R. Civ. P. 33(b). As such, identifying or producing documents alone is insufficient to respond to this interrogatory.

To be sure, the plaintiff's reticence to further respond to Interrogatory No. 10 is not wholly unreasonable. The plaintiff responded in appropriate narrative form as to the VINs listed in paragraph 57 of the Counterclaim, and the record reflects that it has previously provided explanations as to all of the VINs in letter form. (Dkt. No. 98-10). Although the defendant is entitled to an answer from the plaintiff made under oath, *see* Fed. R. Civ. P. 33(b), it may be that the plaintiff will have to do little more than restate the assertions it has already made in previous correspondence. Although the defendant may want the answer to more closely track the Sales Policy, it does not have the privilege of dictating how the plaintiff responds to the question beyond formulating the interrogatory itself. Of course, if the

---

[8] In addition, parties' answers to interrogatories bear an evidentiary weight comparable to answers given in deposition testimony or at trial. *Victory Carriers, Inc. v. Stockton Stevedoring Co.*, 388 F.2d 955, 959 (9th Cir. 1968). The defendant's own determinations of what the plaintiff's defenses could or should be based on the documents produced, by contrast, would not be evidence of anything.

14

plaintiff's explanations are incongruous with the Sales Policy, that may ultimately bolster the defendant's claim that the plaintiff violated the policy. It is for the plaintiff to decide what level of specificity is warranted.

In sum, the plaintiff shall provide a supplemental answer to Interrogatory No. 10 in which it states its contention that the VINs listed in both paragraphs 56 and 57 of the Counterclaim were properly reported as sold.

### C. Attorneys' Fees

Where, as here, the court grants a motion to compel, it "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, "the court must not order this payment if . . . the opposing party's nondisclosure, response, or objection was substantially justified." *Id.* As to Interrogatory No. 10, the court finds that the plaintiff's response was substantially justified, and so no fees should be awarded on that basis. As to the RFPs, the court is less convinced. Accordingly, if the defendant wishes to pursue its request for fees, it should submit documentation reflecting the fees it incurred in seeking the contested documents. The plaintiff may then file a supplemental brief explaining why its

15

position was substantially justified and why fees should not be awarded.

**V.  CONCLUSION**

For the foregoing reasons, the defendant's motion to compel is ALLOWED as stated herein.


So Ordered.                                         /s/ Donald L. Cabell
                                                    DONALD L. CABELL, U.S.M.J.

DATED:  August 21, 2023